Filed 4/30/25  P. v. Andrade-Monterrosas CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>JOSE ANDRADE-<br>MONTERROSAS,<br><br>　　　Defendant and Appellant. | A167352<br><br>(Contra Costa County<br>Super. Ct. No. 01001977537) |

Defendant and Appellant Jose Andrade-Monterrosas was convicted of attempted lewd act on a child, meeting a minor for lewd purposes, and contact with a minor for a sexual offense based on his online contact with a police officer posing as a young girl.  He contends the evidence was insufficient to support the convictions and the trial court erred in refusing his request for a jury instruction on entrapment.  We affirm.

**BACKGROUND**

**I.**

***Procedural Background***

Andrade-Monterrosas was charged by information filed on December 28, 2021, with attempted lewd act upon a child (Pen. Code, § 665/288, subd. (a)) (count 1), meeting a minor for lewd purposes (*id.,*

1

§ 288.4, subd. (b)) (count 2) and contact with a minor for sexual offense (*id.,* § 288.3, subd. (a)) (count 3).

After a jury trial in January 2023, Andrade-Monterrosas was found guilty of all counts. On February 27, 2023, he was sentenced to a two-year period of formal probation and required to register as a sex offender for life. He filed a timely notice of appeal on March 1, 2023.

## II.

### *Factual Background*

#### A. The People's Evidence

The conduct underlying Andrade-Monterrosas's convictions arose from his communications on an internet dating platform with a police detective posing as a young woman. The officer, Detective Joseph Nunemaker, testified at trial as an expert in child exploitation cases.

Nunemaker was in the Investigations Division of the Brentwood Police Department and specialized in sex crimes and child abuse. For four years preceding the events in this case, he had been a member of the Internet Crimes Against Children Task Force (ICAC), which he described as composed of about 61 coordinated task forces across the country, comprising some 4,700 federal, state and local law enforcement officers. ICAC's primary job is to "protect children online from sexual exploitation." Nunemaker explained that in addition to investigating tips concerning suspected child sexual assault material online,[1] task force members conduct "proactive chat detail"

---

[1] Nunemaker testified that ICAC often receives "cyber tips" from the National Center for Missing and Exploited Children, which receives information from electronic service providers and computer applications. Task force members follow up on these investigations and try to "rescue and support the children who are being exploited" and hold the predators accountable.

in which they "go online and pose as children seeking out those who are looking for kids to exploit sexually and participate in illegal sexual activity."[2] One of the platforms frequently used for these proactive investigations is Skout, a "dating or hookup platform" that requires users to be 18 years of age or older but does not verify the birthdates users provide. Nunemaker testified that it was "known to law enforcement that many predators go on to the Skout platform . . . knowing that there can be and there are teens on there."

Nunemaker consistently used the same persona online: a 13-year-old girl named Jimena. He used a photograph of himself that was "age regressed" and "change[d] the appearance of [his] gender." Nunemaker never started conversations, in part because people would reach out quickly, after seconds or a couple of minutes, and to avoid targeting people other than those "wanting to commit the illegal acts." He did not solicit sexually explicit photos; he let the other person "lead the direction that they want things to go" because, as members of ICAC, "we don't want to entrap somebody into doing something they weren't otherwise going to do themselves."

On the afternoon of December 6, 2021, Nunemaker was posing as Jimena on Skout. He estimated that 75 to 100 people contacted him that day, one of whom went by the name Chester and was later identified as Andrade-Monterrosas. Chester indicated he was interested in chatting, saying, "Hello [¶] you're cute" and sending a rose emoji. Chester's profile said he was 35 years old.[3]

---

[2] Nunemaker explained that this exploitation sometimes consists of a person soliciting nude photos of a child or videos of a child performing sex acts on themselves or on someone else and sometimes involves the adult trying to meet with the child and perform sexual acts.

[3] Andrade-Monterrosas was actually 41 years old.

Nunemaker, as Jimena, accepted Chester's chat request and Chester said, "Hello [¶] How are you." Jimena responded, "hi there. ty [thank you]." Jimena said she was from Martinez and Chester said he was from Richmond. He then said in Spanish that he was about 15 minutes away, followed by a text saying the same thing in English.[4] Jimena thanked him for the translation and commented, "15 min is cloooose." He asked, "What relationship are you looking for" and she replied, "nothing serious," and asked how old he was. He said he was 35 and she said, "i'm a lot younger" and "i hope that is ok," then "i'll be 14 next month." Chester said, "It's not a problem for me," then "I don't know if it's a problem for you." Jimena replied, "no, i kinda love it."

Jimena asked what he was doing and Chester said he was working but was "almost out," and that he worked in a furniture store in Martinez. She then asked if they could switch to messaging directly to her phone because she was afraid of losing their messages.[5] She gave him a phone number and they continued texting.

Jimena asked what he was doing after work and Chester said, "I get home I take a shower and watch movies," then "or I start cooking to eat" and "rest for the other day to work." She asked what kind of movies he liked, and he said he liked horror movies and action movies; she asked, "are you just

---

[4] Nunemaker is fluent in Spanish. Most of the texts were in English but Nunemaker testified that some were "not necessarily very clear English." A couple of Chester's texts were in Spanish followed by what Nunemaker believed to be a more or less accurate translation into English and others were translated a little differently than Nunemaker translated them.

[5] Nunemaker explained that he did this because he had past experience of losing messages when he was "flagged or shut down" due to discussing being underage.

going to rest after work today?" and said, "i like those too." She said she liked sports, then said, "i just broke up with my bf [boyfriend] so sort of sad."

Chester responded with messages saying "Sorry," "Sometimes there are people who do not value," "Or they don't know how to value," and "I understand you." He then asked, "Would you like me and you to get to know each other?" When Jimena replied, "that makes me happy," Chester said, "of course, if you want to" and asked if she would like to go out for a coffee or dinner. She said, "sure dessert first?" He said, "Of course it will be as you want" and she replied, "i don't like to be in control," "what do u want," "i'm open." Chester sent an emoji with a smile and large eyes and said, "I would just like to meet you and we'll see what happens at the moment." Jimena said, "that sounds nice."

Chester said he would let her know when he got off work and Jimena asked what time that would be, adding "i can't be [out] too late but want to meet." He said he would leave around 4 and suggested "7:30 a.m." She asked if he meant "am" or "pm" and asked if it would work to meet when he got off work, and he agreed. Jimena then said her grandmother would be home around 6:30 p.m. and she did not know what her grandmother had planned. Chester said, "If you want I can pass by you," then "Or we can meet somewhere if you want." Jimena said, "we can meet that way no one sees you coming by my house" and asked what they were going to do, as she would only have "an hour or two."

Jimena said she was "a little nervous" and Chester told her, "Don't worry I'm the same," "I hardly go out," "I've always been working," then "what I want is for you to feel good and be happy." She asked, "how are you going to make sure i feel good?" and he said, "I want to see you happy." She said she wanted to be happy and feel good and asked, "what can i do for you?"

Chester said, "I too would like to be happy and content." Jimena said she was "getting excited" and asked "what specifically would you want to do tonight? how can i calm my nerves?"

The next texts from Chester said he had left work and was on his way home. After texts confirming they were going to meet at 7:30, Jimena said they "might have to be quick" because her grandmother would be home around 8:30. Then she asked, "how will i make sure i don't get pregnant" followed by, "i hope that's not too forward." He replied with a smiley face and said, "that will not happen we will be careful." This was followed with a text in Spanish asking for the location of where they were going to meet. Jimena asked, "what do you mean careful?" Chester said, "you told me that you didn't want to get pregnant," "I meant that we will be careful that you don't get pregnant." Jimena said, "good. i just get nervous about it. thx," then told him to let her know when he was on his way. She said she would walk down to the marina to meet him.

Chester said he was going home to shower and would tell her when he was on his way. Next came a text in Spanish that had a misspelled word, but Nunemaker believed was meant to say Chester was en route. Chester said he would be there in about 10 to 12 minutes and asked for a specific location; Jimena described the location, sent GPS coordinates and asked what kind of car Chester was in so she could look for it. She also sent a picture of herself and texted, "can't wait to meet you," asked how close he was and said, "i'm scared. are you coming?" Chester responded, "I'm already here" and "Wow, you are beautiful." Further texts clarified where Jimena was because Chester had initially gone to the wrong place, then when he said he was there and was in a black car, she asked him to flash his lights.

The location Jimena directed Chester to was a "relatively remote" area in a parking lot by the marina, and it was already dark when he arrived at about 7:20 or 7:30 p.m.  Nunemaker's role in the investigation ended after he received notification from the apprehension team that they were present with a black car that had flashed its lights.

Members of the apprehension team were at different locations at the marina, in plain clothes and unmarked cars.  Inspector Charles Blazer, from the Contra Costa County District Attorney's Office, testified that he had received pictures of Chester and a description of the vehicle he would be in and knew Chester had been told to flash his lights when he arrived.  When he heard that the subject had arrived and saw his brake lights flash, Blazer drove to the parking lot.  Blazer saw the subject, whom he recognized as the person in the picture of Chester and identified at trial as Andrade-Monterrosas, standing at the side of his car, outside the driver's side door, in the middle of an empty parking lot.  Blazer told Andrade-Monterrosas he was being detained for investigation, searched him and removed a wallet and a cell phone.  He gave these items to Walnut Creek Police Officer Melinda Hall, who had arrived at the scene.

Officer Hall took custody of Andrade-Monterrosas.  She found his identification and a wrapped condom in the wallet.  Subsequently, a forensic download of the cell phone was completed.

**B. The Defense Case**

Benjamin Rose testified for the defense as an expert in forensic cell phone examination and analysis.  He reviewed the downloaded contents of Andrade-Monterrosas's cell phone and found images of nude women who appeared to be adults.  He did not find any videos he would consider pornography or any programs or applications he associated with child

7

pornography, and there were no images or videos that contained keywords associated with child pornography.  He did not find other messages with anyone who identified themselves as under age 18.  Rose was not able to see any web history records or searches on the phone, so he had no knowledge as to what searches had been done or websites had been accessed.  He did not find any of the type of programming that could be used to access child pornography through the dark web or peer-to-peer applications.

Gloria Murillo, who was 41 years old, met Andrade-Monterrosas through an application "to make friends" and had known him for three years.  At some point Andrade-Monterrosas had seemed to be interested in her as more than friends, but she was not interested and he never pursued a sexual relationship she did not want.  She had spent time with him together with his 11-year-old son and her children, ages 24, 16 and 4, and she had brought Andrade-Monterrosas to family gatherings.  She had never seen him act inappropriately with her own or others' children and never saw any indication he was interested in anyone other than adult women.  The charges in this case did not alter her opinion of him, and the text message discussing how to make sure Jimena would not get pregnant did not comport with Murillo's understanding of him as a person.

Blanca Jomez had known Andrade-Monterrosas for 14 years; they were married for 7 years and she was his son's mother.  She was 14 years older than Andrade-Monterrosas.  Nothing in their relationship ever made her believe he was interested in anyone other than adult women, and she had never seen anything about him that made her concerned about leaving her son with him.  If she had believed he was interested in a sexual or romantic relationship with anyone other than an adult woman, she would have asked for full custody of their son.  Jomez initially testified that she had never seen

8

Andrade-Monterrosas act inappropriately with any children, then later said she had not observed him with children other than their son. Asked if the charges in this case changed her opinion of him, she said she did not know.

**DISCUSSION**

**I.**

*Sufficiency of the Evidence*

**A. Governing Principles**

Andrade-Monterrosas contends there was insufficient evidence to prove the intent required for his convictions. As the jury was instructed, counts 1 and 3 required proof that Andrade-Monterrosas "intended to commit a lewd or lascivious act on a child" under the age of 14 (Pen. Code, § 288, subd. (a), CALCRIM Nos. 460, 1110; Pen. Code, § 288.3, subd. (a), CALCRIM No. 1124), and count 2 required proof that he was "motivated by an unnatural or abnormal sexual interest in children" and "intended to engage in lewd or lascivious behavior" (Pen. Code, § 288.4, subd. (b), CALCRIM No. 1126).

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" (*People v. Maciel* (2013) 57 Cal.4th 482, 514-515.)

9

" ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" [Citations.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

## B. Substantial Evidence Shows Andrade-Monterrosas's Knowledge of Jimena's Age.

Andrade-Monterrosas argues there was no substantial evidence he believed Jimena was 13 years old, as the website required users to be over 18, her birthdate indicated she was over 18 and Andrade-Monterrosas had not been able to assess her age in person or in a video chat. He points out that he told a psychologist after trial that he thought she was joking with him when she said she was underage. He further argues it is "noteworthy" that he was raised in a poor family in Mexico, had only a fourth grade education, and did not come to the United States until he was 16 or 17 years old; his intellectual functioning was in the 16th percentile; he did not speak English well and was assisted in court by a Spanish language interpreter at trial; and he had no criminal record. None of these points make it unreasonable for a juror to conclude Andrade-Monterrosas believed Jimena when she told him she was 13 years old and would soon be 14.

First, the website's requirement that users be over age 18 and the fact that Andrade-Monterrosas had not been able to assess her age in person or

10

by video do not negate a conclusion that he believed she was 13 years old because she directly told him so and "hope[d] that [was] ok." (*People v. Fromuth* (2016) 2 Cal.App.5th 91, 96, 104-105 (*Fromuth*) [defendant continued to make plans to meet for sex after being told he was communicating with 15 year old despite website requiring users to be 18 years old or older]; *People v. Hanna* (2013) 218 Cal.App.4th 455, 463 ["strong" evidence defendant believed he was communicating with 13 year old where he was told she was 13, in middle school and lied about age on website].)

Andrade-Monterrosas does not explain how his lack of a prior criminal record or history of inappropriate conduct, or his being raised in a poor family in Mexico would cause him to disbelieve Jimena's representation of her age. His intellectual functioning and language skills could in theory be relevant to his understanding of what Jimena told him, but his responses in the text conversation belie the inference that he did not understand: When Jimena said she hoped her age would not be a problem, he said it was not a problem for him but recognized it might be for her and, with one exception, his responses to her texts gave no indication he was having trouble understanding her. The exception was when, after their discussion of switching from communicating on Skout to texting directly, she asked, "what time do u get off" He said, "I do not understand," she asked, "ur at work?" and after he replied that he was, she asked what he was doing after work and he said, "I get home I take a shower and watch movies [¶] or I start cooking to eat." Andrade-Monterrosas's responses reflect less than perfect use of English, but no lack of basic understanding. The jury was aware there was reason to question Andrade-Monterrosas's facility with English as he was assisted by a Spanish language translator throughout the trial, and it was able to evaluate Andrade-Monterrosas's understanding of English from the

11

texts, which were in evidence and available for the jury's review. Andrade-Monterrosas's posttrial statement to the psychologist that he thought Jimena was joking about being underage is not relevant to assessment of the evidence supporting the verdict, as it was not presented to the jury. Nor was the jury given any evidence of Andrade-Monterrosas's intellectual capacity and level of education.

### C. Substantial Evidence Shows Intent

Most of Andrade-Monterrosas's argument on appeal, as at trial, focuses on the sufficiency of evidence that he intended to commit a lewd act when he met her. He argues that he did not post or ask for sexually explicit photographs, did not say anything "remotely sexual" to her and suggested picking her up at her home, where she had said she lived with her grandmother, or meeting her for dinner or coffee, not in a remote location. He emphasizes that there was no evidence of previous sexual interest in children.

Detective Nunemaker acknowledged that the only thing Andrade-Monterrosas said that was "clearly about a sexual interaction" was when Jimena asked how they would make sure she did not get pregnant and he responded that they would be "careful." Jimena asked, "how will i make sure i don't get pregnant" and said she "hope[d] that's not too forward." Andrade-Monterrosas responded with a smiley face and said, "that will not happen we will be careful." He then asked where they were going to meet and Jimena asked, "what do you mean careful?" Andrade-Monterrosas said, "you told me that you didn't want to get pregnant," then "I meant that we will be careful that you don't get pregnant."

Andrade-Monterrosas urges this exchange did not constitute substantial evidence that he intended to commit a lewd and lascivious act

12

and could mean that he was not planning to have sexual contact with her. This is no more than an attempt to have us draw different inferences from the evidence than the jury did. Andrade-Monterrosas clearly understood what Jimena was saying, as he assured her they would be "careful that you don't get pregnant." His assurance gave no indication he did not intend to do anything that could result in her getting pregnant. And, understanding that she was anticipating a sexual encounter, he continued planning for their meeting and arrived with a condom in his wallet.

Andrade-Monterrosas argues the condom did not constitute substantial evidence of sexual intent because it is common for men to carry a condom "frequently or at all times" without it necessarily meaning they expect to have sex on any particular occasion. Defense counsel made this argument at trial. The jury was not bound to accept it as reasonable under the circumstances. Given the explicit references to avoiding potential pregnancy in the conversation of a 41-year-old man arranging a nighttime meeting with a 13-year-old girl in a location where other people were unlikely to be present, the jury was justified in viewing the condom as additional evidence of Andrade-Monterrosas's intent. Andrade-Monterrosas points out that he did not suggest the meeting place, but he agreed to it without convincing and expended some effort getting there, as he went to an incorrect location before getting additional directions from Jimena.

Under the substantial evidence standard of review we must apply, "[r]eversal of the judgment is not warranted even if we might have made contrary findings or drawn different inferences, as it is the trier of fact, not the appellate court, that must be convinced beyond a reasonable doubt. (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.)" (*People v. Singh* (2011) 198 Cal.App.4th 364, 368.) In *Singh,* the defendant conceded that the

13

evidence supported a reasonable inference that he had the intent to commit and lewd and lascivious act with a child, but argued his conviction was not supported because more than one reasonable inference could be drawn from the evidence of intent. (*Id.* at pp. 368-369.) Rejecting this argument, *Singh* observed, "Although the jury here was free to accept Singh's contention that he had not formed the requisite intent, the jury was also free to reject that contention." (*Id.* at p. 369.) The same is true here. Andrade-Monterrosas argues that various pieces of evidence do not constitute substantial evidence because they could support inferences of innocent intent. He does not appear to recognize either that the same evidence also supports incriminating inferences or that the combined effect of the evidence as a whole may be more incriminating than any given part on its own. "The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' [Citation.]" (*People v. Cuevas* (1995) 12 Cal.4th 252, 261.) "We may not substitute our conclusion for that of the trier of fact where, as here, the facts support more than one inference." (*Singh,* at p. 369.)

Andrade-Monterrosas argues that the present case is "markedly different" from those cited by the People, in which the online conversations demonstrating intent to commit a lewd and lascivious act on a child involved explicit, detailed discussions of sexual matters. The sexual content of the conversations in cases like *Singh, supra,* 198 Cal.App.4th at page 367, *Fromuth, supra,* 2 Cal.App.5th at pages 96-98, and *Hanna, supra,* 218 Cal.App.4th at pages 458-459, was indeed considerably more explicit and extensive than in the present case. But this does not render the evidence in the present case insubstantial. As we have said, the evidence shows that although Andrade-Monterrosas may have initially thought he was contacting

14

an adult, Jimena quickly informed him she was 13 years old. His response to her concern about getting pregnant supports, if not compels, an inference that he knew she was expecting a sexual encounter, and his continuation of their plans to meet amply supports the inference that he intended to commit a lewd and lascivious act when he met her.

Andrade-Monterrosas's attempt to characterize his conduct as innocent—he "[a]t most" had a "friendly text conversation" with Jimena, agreed to meet her at a location she selected and "happened to have a condom in his wallet when he arrived"—ignores the obvious inferences to be drawn from the conversation of a 41-year-old man, on an internet "dating or hookup platform," arranging to meet a child he knew was 13 years old and expected a sexual encounter. (See *Fromuth, supra,* 2 Cal.App.5th at p. 105 ["We cannot credit defendant's claim that it is not 'unnatural' or 'abnormal' for a 'lonely' 30-year-old man who initially responds to an advertisement seeking a sexual rendezvous with a female he believes to be an adult and immediately learns that the female is *a 15-year-old child* to proceed to arrange a sexual rendezvous with that child"].) Similarly, the absence of evidence that Andrade-Monterrosas had previously shown sexual interest in children does not necessarily refute the inferences to be drawn from his conduct on this occasion. (*Id.* at p. 104 [conduct in current case sufficient to support reasonable inference of general sexual interest in children despite absence of evidence of interest].)

In short, the innocent explanations Andrade-Monterrosas offers for the conduct and statements the People presented as evidence in this case do not require a conclusion that the incriminating inferences apparently drawn by the jury were unsupported. Rather, the incriminating inferences were reasonable and supported by the evidence.

## II.

### *Entrapment Instruction*

### A. Additional Background

Andrade-Monterrosas requested a jury instruction on entrapment (CALCRIM No. 3408), arguing there was no substantial evidence he formed an intent to engage in criminal conduct prior to the undercover officer's entreaties.[6]  His written motion argued the instruction should be given because he did not initiate any sexual communication with Jimena and his

---

[6]  CALCRIM No. 3408 informs the jury that entrapment is a defense which the defendant has the burden of proving by a preponderance of the evidence.  As relevant to this case, the instruction provides:

"A person is entrapped if a law enforcement officer . . . engaged in conduct that would cause a normally law-abiding person to commit the crime.

"Some examples of entrapment might include conduct like badgering, persuasion by flattery or coaxing, repeated and insistent requests, or an appeal to friendship or sympathy.

"Another example of entrapment would be conduct that would make commission of the crime unusually attractive to a normally law-abiding person.  Such conduct might include a guarantee that the act is not illegal or that the offense would go undetected, an offer of extraordinary benefit, or other similar conduct.

"If an officer . . . simply gave the defendant an opportunity to commit the crime or merely tried to gain the defendant's confidence through reasonable and restrained steps, that conduct is not entrapment.

"In evaluating this defense, you should focus primarily on the conduct of the officer.  However, in deciding whether the officer's conduct was likely to cause a normally law-abiding person to commit this crime, also consider other relevant circumstances, including events that happened before the crime, the defendant's responses to the officer's urging, the seriousness of the crime, and how difficult it would have been for law enforcement officers to discover that the crime had been committed.

"When deciding whether the defendant was entrapped, consider what a normally law-abiding person would have done in this situation.  Do not consider the defendant's particular intentions or character, or whether the defendant had a predisposition to commit the crime."  (CALCRIM No. 3408.)

intent to engage in lewd conduct was formed only in response to the officer's appeals to friendship or sympathy. At the conference on jury instructions, defense counsel argued that Andrade-Monterrosas and Jimena initially discussed mundane topics like work and movies, and the tenor of the conversation changed only after Jimena said she was sad because she had broken up with her boyfriend. Andrade-Monterrosas argued the officer tried to change the nature of the conversation and to have Andrade-Monterrosas make explicitly sexual comments.

The trial court questioned defense counsel: "What in the chat made your client engage with somebody that identified himself—or theirself as 13 years old? What cajoling, what enticement, what did the officer do to get your client to continue to engage with somebody that had, quite frankly spoken up and said I'm 13 or I'm almost 14? At what point did your client try to end the conversation or say, Okay, we can't meet up or this isn't appropriate?" Counsel responded that talking to a 13 year old is not a crime, the conversation Andrade-Monterrosas initiated was "mundane, benign," and he was "cajoled" to have a "sexual communication with her."

The court asked where this could be seen in the texts—"where . . . does it say I can't meet with you unless you tell me what you want or I need to hear from you first about what you're willing to do for me? And how did that . . . conversation result in Mr. Monterrosas showing up with a condom in his wallet?" After defense counsel argued there was no evidence the condom was in Andrade-Monterrosas's wallet specifically for that occasion and reiterated that Andrade-Monterrosas had been charged only because of the officer's questioning, the court responded, "Well, no, I think it's because your client got into a car and drove to a location and also had a condom in his wallet."

17

The court continued, "Yes, you can argue that a lot of people carry condoms, but . . . what about the conversation caused your client to get into a car and meet up with a 13-year-old? · How was he cajoled into doing that? · What was he promised or enticed to do that? · How did he try to disengage and the officer wouldn't let him under the statutory definition of entrapment?" The court stated, "what the jury instruction contemplates is something more than putting a suggestion out there. · What the jury instruction is talking about is doing something that a normally law-abiding citizen would not then engage in because they're being enticed or cajoled or made promises of things. [¶] . . . Detective Nunemaker threw out the innuendos. · Your client did not really respond other than to say 'You don't have to worry about that' in response to 'I don't want to get pregnant.' [¶] . . . Other than that, what about this conversation caused him to feel like he had to get in the car and meet at the location? . . . [W]here was he entrapped there? Where was he forced or told? [¶] . . . [T]here was nothing in that conversation where he was told, 'Come on, meet with me,' 'I'll show you a good time,' 'You won't get in trouble.' There's nothing in the conversation where he was resisting meeting up, so that's where I'm having some trouble. [¶] . . . [I]t's not sexually explicit, some conversations are more sexually explicit, but there's nothing that's leaping out at this point about that conversation that enticed your client unlawfully to get into his car and drive out there."

Defense counsel disagreed that she had to prove Andrade-Monterrosas "was rejecting the officer's questions" and argued the evidence that the officer was "acting as the lead," "changing the tone of the conversation" and making appeals to sympathy was sufficient to support giving the instruction.

18

The prosecutor maintained there was no evidence of entrapment, as the officer was "merely present on the website" and it was Andrade-Monterrosas who reached out and wanted to meet. The prosecutor argued that some things the officer asked were "clarifying questions . . . to understand what his intentions were" and nothing about the questions "enticed or caused" Andrade-Monterrosas to "drive to a location in the dark, in the nighttime." The prosecutor added that Andrade-Monterrosas's intent was further shown by the fact that after he first went to the wrong location, he did not give up but continued trying to find the correct one.

The court denied the request for the instruction, stating, "There is nothing about Detective Nunemaker's text messages that would have induced a normally law-abiding man to arrange to meet up with a 13-year-old.· There's nothing about it. [¶] The fact that he asked generic questions that didn't receive a response, again, he didn't pressure him to say spell it out for me, I need to know.· He just asked what it meant and that was it and then they arranged to meet. [¶] But there was nothing about those text messages in and of itself where he was pressured or cajoled or any enticement at all. ·There were no promises.· There was nothing even such as I can't wait to see you, I really need you to hold me, You're going to be my first, anything. There was nothing.· It was actually a rather banal conversation as far as 288.4 go[es]."

## B. Governing Principles

"A trial court is 'required to instruct the . . . jury on the defense of entrapment if, but only if, substantial evidence supported the defense. [Citations.]'  (*People v. Watson* (2000) 22 Cal.4th 220, 222-223 (*Watson*).)  We review the record to determine whether defendant presented substantial evidence to support the claimed defense and thus require the trial court to

19

give the jury the entrapment jury instruction. [Citations.]" (*People v. Federico* (2011) 191 Cal.App.4th 1418, 1422.)

"In California, the test for entrapment focuses on the police conduct and is objective. Entrapment is established if the law enforcement conduct is likely to induce a *normally law-abiding person* to commit the offense. ([*People v.*] *Barraza* [(1979)] 23 Cal.3d [675,] 689-690 [*Barraza*].) '[S]uch a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully. Official conduct that does no more than offer that opportunity to the suspect—for example, a decoy program—is therefore permissible; but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime.' (*Id.* at p. 690.)" (*Watson, supra,* 22 Cal.4th at p. 223.)

"The *Barraza* court described two guiding principles. 'First, if the actions of the law enforcement agent would generate in a normally law-abiding person a motive for the crime other than ordinary criminal intent, entrapment will be established.' (*Barraza, supra,* 23 Cal.3d at p. 690.) . . . 'Second, affirmative police conduct that would make commission of the crime unusually attractive to a normally law-abiding person will likewise constitute entrapment. Such conduct would include, for example, a guarantee that the act is not illegal or the offense will go undetected, an offer of exorbitant consideration, or any similar enticement.' (*Ibid.*)" (*Watson, supra,* 22 Cal.4th at p. 223.)

**C. Analysis**

Andrade-Monterrosas argues that entrapment was an applicable defense in this case because Jimena "importuned" and "cajoled" him into

meeting in person and only Jimena "insinuated a sexual intention." He maintains that while Jimena repeatedly asked what time Andrade-Monterrosas got off work and what he was doing after work, thus implying she wanted to meet, Andrade-Monterrosas did not suggest meeting until after Jimena appealed to his friendship and sympathy by saying she was sad about breaking up with her boyfriend. Jimena also repeatedly asked what Andrade-Monterrosas wanted, "clearly fishing for some sexual motivation," but he responded only, "I would just like to meet you and we'll see what happens" and "what I want is for you to feel good and be happy." She asked, "what do you have in mind" and "what specifically would you want to do tonight," and he did not respond. Jimena "repeatedly" raised the idea of sex by asking how they would avoid her becoming pregnant, then asking him to clarify what he meant by "careful."

We agree with the trial court that the present case does not involve the kind of " 'pressure . . . by overbearing conduct' " (*Watson, supra,* 22 Cal.4th at p. 223) necessary for the entrapment defense. " '[T]he rule is clear that "ruses, stings, and decoys are permissible stratagems in the enforcement of criminal law, and they become invalid only when badgering or importuning takes place *to an extent and degree that is likely to induce an otherwise law-abiding person to commit a crime.*" ' [Citation.].)" (*Ibid.*, italics added.) As Andrade-Monterrosas points out, Nunemaker asked several times when Andrade-Monterrosas would get off work and what he was doing that night, and Andrade-Monterrosas did not suggest meeting until after Jimena said she was feeling "sort of sad" about breaking up with her boyfriend. If Jimena's comment can be seen as an appeal to sympathy, it was a mild one; it certainly cannot be understood as an appeal that would induce a "normally law-abiding person" to commit a crime "because of friendship or sympathy."

(*Barraza, supra,* 23 Cal.3d at p. 690.) Nothing Nunemaker said in this part of the text conversation could reasonably be construed as pressure, much less overbearing pressure. Nor does the rest of the conversation support Andrade-Monterrosas's characterization that Nunemaker "harangued [Andrade-Monterrosas] over and over to consider meeting in a remote location with a child."

Andrade-Monterrosas's attempt to portray himself as the innocent subject of entrapment not only overstates Nunemaker's conduct but emphasizes benign explanations to the exclusion of reasonable inferences to be drawn from the evidence. Although the initial conversation between Andrade-Monterrosas and Jimena was relatively innocuous, circumstances matter. They were communicating on an internet "dating or hookup platform." Andrade-Monterrosas began the conversation with three successive texts: "Hello," "you're cute," then a rose emoji. In context, the jury could reasonably infer that Andrade-Monterrosas, at the outset, was looking for a romantic or sexual connection. Even assuming Andrade-Monterrosas expected users of the site to be at least 18 years old, he quickly learned that Jimena was 13 years old but continued to chat with her and make plans to meet. (*Fromuth, supra,* 2 Cal.App.5th at pp. 104-105 [defendant's sexual interest in children not reflected in initial response to advertisement but by continued pursuit after learning she was 15 years old].) His comments about wanting to make Jimena "feel good" and "be happy" *could* support the inference he suggests, a wish to counteract Jimena feeling "sad" about her breakup, but—again, considering context—reasonable jurors could draw the inference of sexual intention attributed to the comments by the prosecutor. Although Jimena was the first to refer to sex overtly by asking about preventing pregnancy, Andrade-Monterrosas gave no indication he was

22

surprised by her question or did not intend any sexual contact; he simply told her they would be careful.

As we have said, official conduct that does no more than offer the suspect an opportunity to commit a crime is insufficient to establish entrapment; the conduct must be "likely to induce a *normally law-abiding person* to commit the offense." (*Watson, supra,* 22 Cal.4th at p. 223.) Andrade-Monterrosas continued the conversation with Jimena and went to meet her in person that night with knowledge that she was 13 years old and, considering the context and contents of the conversation, that the purpose of the meeting was sexual activity. It is difficult to credit the suggestion that a 41-year-old man who normally would have no sexual interest in children and no intention to commit a lewd and lascivious act with a child would be induced to pursue such an act by Nunemaker's questions and statements. Nunemaker offered an opportunity that Andrade-Monterrosas took advantage of; the officer did not pressure, importune or cajole Andrade-Monterrosas in the overbearing manner required for an entrapment defense.

## DISPOSITION

The judgment is affirmed.

STEWART, P. J.

We concur.

MILLER, J.

DESAUTELS, J.

*People v. Andrade-Monterrosas* (A167352)